In the Matter of **PHYSICIANS AND DEN-
TISTS INVESTMENT CORPORA-
TION, Bankrupt.**

**No. 4708.**

United States District Court
D. South Carolina,
Columbia Division.

Sept. 29, 1966.

See also D.C., 248 F.Supp. 968.

■■■■■■■■■■■■

Marion L. Powell, Powell, George & Poston, Aiken, S. C., for Vernon R. Scott, Trustee.

James D. Walters, Columbia, S. C., for William J. Brockington.

W. C. Boyd, Special Referee, of Boyd, Bruton, Knowlton & Tate, Columbia, S. C.

HEMPHILL, District Judge.

This court assumed jurisdiction in bankruptcy upon the filing of June 8, 1962 of a creditors' petition under Chapter X of the Bankruptcy Act for reorganization of Physicians & Dentists Investment Corporation, which ultimately resulted in the debtor being adjudicated a Bankrupt. The original order stayed a certain proceeding then pending in the Court of Common Pleas for Richland County entitled "William J. Brockington, Plaintiff vs. Physicians & Dentists Investment Corporation, Defendant."

The action in the state court involved a certain lease executed February 18, 1960, wherein the plaintiff alleged default and forfeiture to him from defendant of a certain building on Millwood Avenue in the City of Columbia for nonpayment of rent on a ground rent lease and nonpayment of taxes and insurance on a building lease. The state court action was commenced on or about April 19, 1962, less than four (4) months from the filing of the original petition in bankruptcy.

By Rule to Show Cause dated April 27, 1962, the Honorable John Grimball handed down his Order in the Court of Common Pleas for Richland County appointing a Receiver who assumed his duties on May 4, 1962. The Receiver was given leave and did file an answer to the pending cause. The state court proceeding was then referred to the Richland County Master in Equity and subsequent to a reference but before the Master made a report the proceedings were stayed by Order of this court.

The stay of the State court proceeding was finally vacated on January 8, 1964, in order that the proceeding might proceed in an orderly manner to judgment in the State court thereby avoiding unnecessary expense attendant to its being retried in this court. However, the removal of the stay of such proceedings contemplated that the debtor's rights be protected in the state court proceedings by the Trustee and his attorneys in the same manner and fashion as if the cause were heard in this court. In vacating the stay this court ordered:

"3. That the Trustee and his attorneys provide proper representation for debtor in said State Court Brockington case in order that debtor's rights and property be preserved as if the cause were being heard in this Court."

Thereafter the Richland County Master in Equity made his report recommending forfeiture of the building in question to the plaintiff as of September 1, 1961. The Trustee's attorneys made no effort to formally intervene by petition to the state court but did within the statutory time file exceptions to the Master's Report. The Trustee's attorneys claim that the state court Receiver was discharged by Order of the state court on November 9, 1962, which was conditioned upon his complying with the terms of the order which included an accounting with the Trustee and turning over all assets of the debtor in his possession. Since these matters had not been attended to the Trustee's attorneys contended that the Receiver's Attorneys were still attorneys of record in the state court proceeding. Accordingly, the exceptions to the Master's Report were filed by the Trustee's attorneys with the Receiver's attorneys appearing "of counsel". Without passing on the validity of this attempt to appear in the state court suffice it to say that the attorney for Dr. William J. Brockington was successful on motion before the state court to cause the exceptions to the Master's Report to be vacated on the technical ground that they were not filed by "attorneys of record". Accordingly, the

Trustee has never had his day in the state court. Neither were the conditions imposed by this court in vacating the stay complied with. Dr. Brockington was the moving party in having the stay of his state court proceeding vacated, was therefore aware that vacating the stay was conditioned on the Trustee becoming a party, yet successfully resisted his appearing and defending the state court proceedings.

After an unsuccessful attempt by the Trustee's attorneys to subsequently intervene formally and aborted appeals of adverse orders of the state court, the plaintiff, Dr. William J. Brockington obtained an Order and Judgment in the state court allowing forfeiture of the building and asserting his entitlement to all funds collected by the state court Receiver and federal court Trustee for rental since September 1, 1961, the date found for forfeiture.

This court believes it in order to review the history of the transaction between Dr. William J. Brockington, and Physicians & Dentists Investment Corporation.

Dr. William J. Brockington, a resident and practicing dentist of Columbia, South Carolina, owns a piece of property on Millwood Avenue in the City of Columbia on which, according to his testimony, he decided late in 1959 to construct a dental clinic. He was approached early in 1960 by the then President of Physicians & Dentists Investment Corporation, the Bankrupt herein, to enter into an alleged tax savings plan in connection with the construction of his proposed clinic.

Apparently, the plan consisted of Dr. Brockington leasing his piece of property to the corporation for a period of 15 years. The Corporation, using its funds, was to construct a building according to plans and specifications prepared by Lyles, Bissett, Carlisle & Wolfe, Architects selected by Dr. Brockington. The Architects' plans called for a duplex type of building with approximately one-half of the space designated for the dental clinic and the other one-half designated for ordinary commercial use. The Corporation was to lease the one-half designated for the dental clinic to Dr. Brockington for a period of 15 years. The Lease of the land to the corporation and the Lease of the building to the Doctor were to be concurrent.

Presumably, the alleged tax savings under this plan might be measured with the difference in deductible depreciation expense if the Doctor had built and owned the building, as compared to the possibility of deductible fixed monthly rental expenses if the corporation built the building and leased space for his Clinic to him.

At the expiration of the 15 year term, each Lease would terminate, and since there was to be no renewal right in either Lease, Dr. Brockington's title to the land would become divested of the Lease encumbrance and presumably the title to the building would vest also in him by virtue of the building being part of the realty.

From the testimony and Exhibits, I conclude the foregoing, which though somewhat simplified here, was the plan between the Doctor and the Corporation, and the probable reasons for the transaction as far as the Doctor was concerned.

The plan was put into effect by the execution of the two Leases on or about February 18, 1960. Each Lease called for rental payments to commence the first day of August, 1960. The Lease by the Doctor to the Corporation was to yield the Doctor One Hundred and No/100 ($100.00) Dollars, per month for 15 years or a gross rental of Eighteen Thousand and No/100 ($18,000.00) Dollars. The Lease by the Corporation to the Doctor for one-half (½) of the building called for monthly rental payments of Three Hundred Twenty-nine and 54/100 ($329.54) Dollars, grossing for the full term of 15 years the sum of Fifty-nine Thousand Three Hundred Seventeen and 20/100 ($59,317.20) Dollars.

The President of the Corporation at the time of these transactions apparently

was not available to testify and there is no evidence regarding the actual cost of the building. There is evidence regarding the value of the building and its size.

Dr. Brockington testified that his side of the building had 1925 square feet and that the other side, which was occupied by the corporation, had 2,000 square feet. Mr. R. W. Robinson of Robinson Realty and Insurance Company in Columbia, South Carolina, testified that by tape measure the building was 75 feet by 75 feet or 4,100 square feet. Obviously, there is some error either in the transcript or otherwise, since 75 feet by 75 feet equals 5,625 square feet and presumably the figure of 4,100 square feet was the intended testimony. Mr. Robinson estimated the replacement cost of the building, excluding land, was Fifty-Two Thousand and No/100 ($52,000.00) Dollars. Dr. Brockington, in his testimony, valued the building at Forty-five Thousand and No/100 ($45,000.00) Dollars. However, the Lease on the building between the Corporation and Dr. Brockington required the Corporation to pay insurance and taxes and keep the insurance in force in the sum of Fifty-three Thousand Five Hundred and No/100 ($53,-500.00) Dollars.

It is obvious that the building must have been worth some amount between Forty-five Thousand and No/100 ($45,-000.00) Dollars, and Fifty-three Thousand Five Hundred and No/100 ($53,-500.00) Dollars, as these are the lowest and highest figures regarding its value adduced from the testimony.

Inasmuch as Dr. Brockington was to receive a gross rental on his land lease of Eighteen Thousand and No/100 ($18,-000.00) Dollars, and he was to pay on the building Lease a gross rental of Fifty-nine Thousand Three Hundred Seventeen and 20/100 ($59,317.20) Dollars, it is simple to compute that he contracted effectively to pay a net sum of Forty-one Thousand Three Hundred Seventeen and 20/100 ($41,317.20) Dollars for the building over a period of 15 years, and the corporation was to pay all insurance and taxes.

No question has been raised about the propriety or validity of these Lease contracts. However, since the leases are involved in the controversy, it is disturbing to the conscience of the court, now that the corporation is bankrupt, that the testimony shows that Dr. Brockington was a Director of the Corporation.

There is conflict in the testimony regarding the period of time in which Dr. Brockington was a Director, but the exhibits indicate that he was present at meetings of the Board of Directors of the Corporation on May 17, 1961, July 20, 1961, and October 9, 1961, and again on January 16, 1962. Dr. Brockington testified that he resigned as a Director on or about February of 1962. He testified that he was a director of the corporation on two occasions, being elected the last time in June or July of 1961. He further testified that he had been a member of the Board for a few months prior to his election in June or July of 1961. The minute books of the Corporation were poorly kept and it is not possible to ascertain from them the exact date of his first election as a Director. The court is, therefore, unable to find out whether or not he was a Director in February of 1960 at the time of the execution of the two Leases.

The records show that he was issued certificates of stock of the corporation on December 16, 1960 and December 31, 1960.

The lease of the land to the corporation provided that if one month's rent should at any time be in arrears and unpaid for a period of thirty (30) days, that the Lessor should have the right to annul and terminate the Lease, and it should be lawful for Lessor to re-enter and forthwith repossess all and singular the leased premises without hindrance of prejudice to the Lessor's right to destrain for all rent unpaid for such period.

The lease has no express covenant that an assignment by operation of law or the bankruptcy of a specified party thereto

or of either party shall terminate the lease or give the other party an election to terminate the same.

Rental payments were unpaid and past due from September 1, 1961, through April 1, 1962, in the amount of Eight Hundred and No/100 ($800.00) Dollars. Dr. Brockington paid County and City taxes for the year 1960 in the total sum of Twenty-six and No/100 ($26.00) Dollars, but it is not clear whether this represented his pro-rata share of 1960 taxes or whether it represented all taxes due for the year 1960, it being Dr. Brockington's obligation to pay such taxes up until the first day of August, 1960.

The record further shows that Dr. Brockington paid the total sum of Five Hundred Eighty-five and 34/100 ($585.34) Dollars, on November 16, 1961, for City and County taxes for the year 1961. Allegation is made that Dr. Brockington paid the 1961 taxes before they became past due on January 1, 1962, and as to such taxes, he became a volunteer and is unable to claim the payment thereof by himself to be an act of default on behalf of the corporation as such taxes did not have to be paid until December 31, 1961.

There is conflict regarding the payment of insurance on the building as it is alleged the non-payment of insurance constituted one of the three acts of default on the ground rent Lease. However, the state court Receiver's report of disbursements contain an entry of payment of $141.00 for fire and liability insurance paid to Reese Real Estate Agency.

The terms of the ground rent lease provided that if the rent should be unpaid for thirty days then the Lessor (Dr. Brockington) should have the right to annul and terminate and that it should be lawful for him to re-enter.

On cross-examination of the doctor in the state court, we find the following interesting testimony:

Q. (By state court receiver's counsel) Why didn't you, when the first month's rent became past due, ask for cancellation of the lease?

A. (By Dr. Brockington) Well, I have an answer for that. The answer is the same reason: I was patient because I wanted to see the company do well; I wanted to see it succeed; and I was trying to be as lenient as I could.

Q. I think that is very admirable and a very direct answer and I agree one hundred per cent; in other words, you voluntarily paid the taxes and you voluntarily allowed the company to become in arrears with the rent, isn't that correct?

A. Well, after repeated asking and requesting my rent money, and I was continually asked to be patient; and I was patient.

Q. And you voluntarily allowed it to take place and allowed it to happen, and you were a member of the Board of Directors all that time?

A. No; I was not a member of the Board of Directors all the time the rent was in arrears.

Q. It was only in arrears from September 1st to February—that is the only period we are talking about.

A. They were in arrears from September 1st, 1961—

Q. All right—when you were a member of the Board. We are talking about the September rent, the October rent, the November rent, the December rent—the January rent—

A. I resigned in February.

Q. You have a copy of that letter where you resigned?

A. Yes, I have.

Q. Would you put it in evidence?

A. Certainly.

Q. I would like to have it.

A. I would like for you to have it.

Q. Then, if you voluntarily allowed this company to owe you, is that correct?

A. I suppose so.

Q. You never demanded possession in a legal manner until after this Re-

ceivership was—the Receiver was appointed, did you?

A. Well, as I answered a moment ago, everything I did was in the interest of seeing this company succeed.

Q. Even after you went off of the Board, you wanted the company to succeed and did everything you could to help them?

A. I have always tried to help them succeed.

As earlier stated the minutes of the Board of Directors reflected the presence of Doctor Brockington on May 17, July 20, and October 9, 1961 and on January 16, 1962. The latter two meetings were held after September 1, 1961, the date of the alleged default, yet when the opportunity for discussing non-payment of rent to his fellow board members was afforded Doctor Brockington he apparently declined, for the minutes are silent on this subject. It is apparent from his testimony that he acquiesced and condoned the non-payment of rent at least from September 1, 1961 until his alleged resignation from the Board of Directors of Physicians & Dentists Investment Corporation sometime in February, 1962. From the record it appears his first act of reentry under the terms of the lease was the commencement of his action in the state court on April 19, 1962, which was less than four (4) months from the filing of the original petition in bankruptcy on June 8, 1962.

The Master in the state court concluded that there was a breach of the ground rent lease as of October 2, 1961, (thirty days after non-payment of the September 1, 1961, rent payment). He further concluded that non-payment by the corporation of real estate taxes and insurance on the building in which space was leased to the Doctor for his dental clinic constituted two additional acts of default on the ground rent lease.

However, inasmuch as the corporation had assigned it rights to rent payments on the clinic space to a Mr. W. A. Nimmer, another director of the corporation, the parties stipulated in the state court before the Master that such lease was still valid and that the Doctor would continue paying rent to Mr. Nimmer by virtue of the assignment.

It is interesting to refer to additional testimony taken before the Master in his reference. On page 67, Mr. William A. Nimmer, under cross-examination by Mr. Monteith, attorney for the state court receiver:

Q. Mr. Nimmer, you knew about the ground lease that the Physicians and Dentists had with Dr. Brockington, for $100.00 a month?

A. I did when I got the full lease; I didn't in the partial lease.

Q. You were on the Board of Directors?

A. Yes, sir.

Q. You were at some of the meetings, and at some you were not there, and didn't know about, I am sure; you knew that under the Lease, Physicians and Dentists were called upon to pay the ground lease of $100.00 a month?

A. I did; that's correct.

Q. You knew they were required to pay the taxes?

A. Yes, sir.

Q. And the insurance?

A. That's correct.

Q. I am sure, as a member of the Board of Directors, you knew that the Physicians and Dentists did not pay the taxes when they were due and did not pay the ground rent for the five or six months that Dr. Brockington described, and I am sure you are familiar with that, aren't you?

A. Yes, sir.

Q. Did Dr. Brockington ever call upon you for payment of those items, as holder of this lease?

A. I don't recall.

Q. You took the lease from Physicians and Dentists subject to all of its terms?

A. That's correct.

Q. Did Dr. Brockington ever call upon you to pay the taxes?

A. I don't believe so; I have no recollection of it.

Q. Did he ever call on you to pay the ground rent?

A. No, sir.

Q. Did he ever tell you he was going to withhold the amount due and owing him from the rent due and owing to you?

A. Not that I know of.

Q. He never asked you for any offset to be made?

A. No, sir.

Q. And you stood in the same position as the assignee of Physicians and Dentists to Dr. Brockington as the original lease you bought from Physicians and Dentists?

A. How was that?

Q. You bought the lease you are talking about, from Physicians and Dentists, didn't you?

A. Yes sir.

Q. And you knew that it was subject to this ground lease for rent?

A. Right.

Q. And you knew the terms of it?

A. Yes, sir.

Q. And you knew your lease was subject to the same restrictions or same requirements that Physicians and Dentists had?

A. I presumed it was identical.

On page 70 of the transcript of testimony before the state court Master in Equity, on Examination by his attorney, Mr. D. W. Robinson, the following is also interesting testimony:

Q. Mr. Nimmer, after this action was brought, and it appeared Dr. Brockington was due some ground rent and some tax money refund, did you furnish money to me to make a tender to him?

A. Yes, sir.

Q. And I returned that money to you when he wouldn't accept it?

A. Yes, sir.

The other issue presented to this court for determination was that of whether or not Dr. Brockington is liable for the payment of two promissory notes aggregating the sum of $18,750.00, which became due and payable on January 1, 1966. The notes were to bear interest after maturity at the rate of five per cent (5%) per annum. The notes also contained provision for the right of the maker to satisfy the notes by transfer of stock in Physicians and Dentists Investment Corporation which had been purchased by giving the notes in payment. Dr. Brockington's counsel contends that his client is not liable for payment on the grounds (1) that he tendered the stock into court for satisfaction of the notes by the terms thereof, and (2) that the notes are unenforceable by the court since the entire transaction was illegal and the parties are in pari delicto.

The Referee concludes that South Carolina seems to hold to the rule that such transactions are voidable and that the statutory prohibition is maintained for the protection of the corporation and its creditors, but not for the protection of one who participated in the illegal transaction of paying for the stock with a promissory note. The Referee relies on Greenville and Columbia R. R. Co. v. Woodsides, 5 Rich. (S.C.) 145 (1851). In the *Woodsides* case, the defendant, in an action to collect the note from him, stated that he agreed to buy stock in the corporation by giving his note for the purchase if the Railroad would be run through Laurensville. He stated that the notes were uncollectible as being void against the Statutes since he gave his note rather than cash. The court held that Mr. Woodsides, by his own acts in participating in the corporation, in his subsequent conduct waived his right to contest the transaction as being illegal under the Statute. See Annot. 78 A.L.R.2d 860 (cited by Referee).

In 18 C.J.S. Corporations § 325, at 827 (1939), the following is stated:

However, such repurchase agreements are not enforceable as against the corporation, if the effect thereof is to

prevent the payment of creditors in full, and so they are not enforceable after the corporation has become insolvent * * * (footnotes omitted).

In 8A C.J.S. Bankruptcy § 339, at 597 (1962):

Defense of pari delicto. In actions by the trustee in bankruptcy, the doctrine that the parties were in pari delicto has been held not available as a defense.

    *     *     *     *     *     *

(Citing Chatz v. Bloom, 322 Ill.App. 435, 54 N.E.2d 889).

Irregularity of issue of corporate stock held no defense to an action by a corporation's bankruptcy trustee for payment thereof. In re Rombach & Co., 9 F.2d 359 (3 Cir. 1926).

At 8A C.J.S. Bankruptcy § 339, at 595 n. 73 is the following:

Defenses to actions on Notes

(1) Even if stock were issued for part cash and a note for the balance, in violation of the constitution, this would not prevent the corporation's trustee in bankruptcy from recovering on the note. Tex.—Smoot v. Perkins, Civ.App., 195 S.W. 988.

(2) A corporation's fraud in inducing a subscription to stock, not being complained of till after its insolvency, will not avail as a defense in an action by its trustee in bankruptcy on a note given for the subscription. Tex.— Smoot v. Perkins, supra.

(3) Where defendant gave a note to a corporation in payment of shares, under the corporation's agreement to deliver shares, and the corporation held the stock as security, its inability to deliver the certificate when it thereafter became bankrupt was no defense to a suit on the note by the trustee in bankruptcy, since the rights of the parties date from the bankruptcy adjudication. Cal.—Reeder v. Finderup, 248 P. 525, 78 C.A. 305.

■ In view of the authorities and the circumstances of this case it is suf-ficient here to say that this court adopts the recommendation of the Master and his finding that Dr. Brockington is liable for the payment of his notes.

This controversy is now before the court on motion of Dr. Brockington's counsel to confirm the order and judgment of the state court which confirmed the State Master's Report and ordered forfeiture of the building to Dr. Brockington as of September 1, 1961, and further ordered that Dr. Brockington was entitled to all rents received by the state court receiver and the Trustee in Bankruptcy since September 1, 1961.

The Honorable W. C. Boyd, Referee in Bankruptcy, held a reference on the motion and recommended that the state court be requested to reopen the case in order that the Trustee may be made a party defendant, with the right to plead to the Complaint and be heard thereon. The main line of reasoning used by the Referee was that the Trustee in Bankruptcy was not substituted as a party defendant in the state court, and for that reason it might be held that the Trustee representing the creditors did not have his day in court.

This court heard exceptions to the Referee's report filed by Dr. Brockington's attorney and entered up a decision on January 13, 1966, stating that "the record now before the court is irresistably persuasive that the Trustee has not had an opportunity to have his day in court. Accordingly, this court in the exercise of its discretion will remand this matter to the Referee in Bankruptcy with direction that he hold an evidentiary hearing *de novo*, with all parties having the right of full presentation. * * * Therefore this entire controversy will be remanded to the Referee in Bankruptcy who will hold an evidentiary hearing *de novo*. The Referee will then make findings and recommendations to the court."

The Referee has conducted hearings pursuant to said order and has made his

report with the following recommendation:

That the trustee institute plenary actions to accomplish the following:

1. That the equities involved make it proper that the lease between William J. Brockington as lessor and the Physicians and Dentists Corporation as lessee (ground lease) dated February 18, 1960, and extending for a term of fifteen (15) years, commencing August 1, 1960, and ending on July 31, 1975, should be declared valid and should inure to the trustee for the benefit of the creditors of the bankrupt corporation; that the trustee should continue to collect the rental from that part of the building leased by trustee with the approval of the referee to Sinclair Refining Company for the term of said lease. From the rentals collected, the trustee should pay all back rent due to lessor, reimburse lessor for all taxes and insurance paid, and in the future continue to pay the required rental and taxes and insurance assessed against said property.

2. That the trustee collect from William J. Brockington on his two promissory notes the sum of Eighteen Thousand Seven Hundred Fifty and No/100 ($18,750.00) Dollars.

Exceptions to the Referee's report were timely filed by Dr. Brockington's attorney in which it was contended that the ground rent lease had been breached by non-payment of rent and under the facts of this case a forfeiture had become a fact and, in essence, the building was now Dr. Brockington's property since by the nature of its construction it was impossible to remove it without total destruction of the building. Dr. Brockington's counsel further excepted on the grounds that the corporation and Dr. Brockington were in pari delicto in issuing the corporation's stock in contravention of the Constitution and statutory law of South Carolina by accepting and giving promissory notes for the payment thereof; further, that the notes contained provisions that the maker

could surrender his stock in full payment and cancellation of the notes and that the stock was tendered into court in satisfaction.

Upon examining the record this court agrees with the Referee's findings of fact and adopts the same as part of this Order and Judgment.

Federal Rules of Civil Procedure 53(e) (2) provides in part: "In Non Jury Actions: In an action to be tried without a jury, the court shall accept the master's findings of fact unless clearly erroneous." See also Collier on Bankruptcy, Volume 4, § 39.16.

This court differs with the Referee in his recommendation that the Trustee institute plenary actions to accomplish his recommendations for the reasons set out following.

■ Dr. Brockington requested this court vacate the stay of the state court action and the condition of this court's order in lifting the stay was that the Trustee be allowed to defend for the benefit of the creditors. Dr. Brockington, rather than insist that the Trustee be made a party and have his day in court, breached the condition of the order vacating the stay, by resisting (and successfully so) the Trustee's attempts to be heard in the state court. The Trustee was therefore never a party to the state court and its judgment is not binding on the Trustee.

In Main v. Hall, In re Rose, 41 F.2d 715 (7th Cir. 1930), it was decided that proceedings in judgment in a state court, rendered within four months of adjudication in bankruptcy to which the Trustee was not a party, were not binding on Trustee. The court stated:

No attempt was made to bring the Trustee in Bankruptcy into the county court proceeding, and he was not bound by the adjudication there. * * * and, since the bankruptcy court had jurisdiction to pass on the question as between Main and the trustee, its order therein is unaffected by the determination of the county court.

In Brown v. Wright, 137 F.2d 484 (4th Cir. 1943), Judge Parker cites the Main v. Hall case holding that Brown, who was Administrator, Office of Price Administration was not bound by a state court proceeding, stating:

> Even if counsel for the Administrator had requested that the cause be continued and that he be allowed to appear therein without designating his requested appearance as that of an amicus curiae, it is clear that the Administrator would not be bound by the judgment, since the motion was denied, and he was never made a party or placed in position to exercise control over the conduct of the case. (citing authorities) And the fact that he may have had the right to intervene in the state proceeding is immaterial, since he did not in fact intervene or in any way make himself a party thereto.

The *Hall* case is further discussed in a commentary in 139 A.L.R. 70:

> It has been held that one who, as president of a creditor bank, and not in his fiduciary capacity of Trustee in bankruptcy of the debtor, participates in the prosecution of a suit to set aside a fraudulent conveyance, is not, as such trustee, estopped by the judgment rendered in that suit, since a party acting in one right can neither be benefitted nor injured by a judgment for or against him when acting in some other right.

There is authority to support the Referee's recommendation that the Trustee institute a plenary action even if the same might be in the nature of a direct attack in the state court. I Collier, Bankruptcy, § 2.06 at 155, n. 9:

> Where, despite a restraining order on the parties, the state court proceeded with a suit and the bankrupt, assuming the order would be obeyed, was absent and suffered a default judgment, the trustee in bankruptcy without becoming a party of record could apply in the bankrupt's name for an order setting the judgment aside for mistake, surprise or excusable neglect.

Manter vs. Howard (1949) 94 Cal.App. (2d) 404, 210 P.(2d) 880.

It is contended that the bankrupt defaulted in the Brockington state court proceedings and the only answer to the complaint which afforded the bankrupt any protection was that filed by the state court Receiver. Conceivably, the Trustee might move the state court to set aside the judgment as in the *Manter* case above.

However, it is well settled that the right of a trustee in bankruptcy to intervene in a cause pending in a state court must be determined in and under the practice and rules of the state court. Drew v. Fort Payne Co., 186 Ala. 285, 65 So. 71, and, Bank of Commerce v. Elliot, Wis., 1901, 109 Wis. 648, 85 N.W. 417, 6 Am Bankr.Rep. 409.

The Court of Common Pleas for Richland County exercising its rights under its rules of practice has already once refused the Trustee's plea to be heard and this court feels it would not be in the best interest of the Trustee to order him to again seek relief in the same court.

If the state court should refuse the motion to reopen the case and vacate the judgment there is some question whether the federal court would have available the relief of restraining the enforcement of the judgment. In re Franklin (D.O. Mass.) 106 F. 666, 6 Am B.R. 285, aff'd sub nom, Jaquith v. Rowley, 188 U.S. 620, 23 S.Ct. 369, 47 L.Ed. 620.

The plaintiff, Brockington, voluntarily came into this court seeking relief by asking this court to vacate its stay order. This court granted the relief requested with a condition in effect that the Trustee be heard and allowed to defend the state court action in the same manner as if the controversy were heard in this court. Furthermore, it was expressly ordered that the property and assets of the bankrupt not be transferred to the state court but remain in the jurisdiction of the federal court.

Now that Brockington has obtained a favorable judgment in the state court

he has once again come back to the federal court voluntarily seeking summary relief. He asks this court to confirm the state court judgment.

In the hearing *de novo* before the Referee April 18, 1966, Brockington's counsel makes it very clear that he expects this court to resolve all issues between the parties. Brockington's counsel made exception to the Referee's report raising only two issues: (1) the lease was in default and the building forfeited, and, (2) that Dr. Brockington was not liable on his notes given for stock of the corporation. Brockington's counsel opened his oral argument in the hearing on the exceptions restating that these were the only two issues.

■ At 8A C.J.S. Bankruptcy § 342 (16) (a) the principal is stated that "summary proceedings not otherwise proper may be employed where the adverse claimant consents thereto or waives his right to plenary suit." In 2 Collier, Bankruptcy, § 23.08, we find the following commentary:

> It is well settled that in all cases where a party is entitled to the determination of his rights in a plenary action he may nevertheless consent to the exercise of summary jurisdiction by the bankruptcy court and in that manner have his rights adjudicated. Section 23b of the Act restricts the jurisdiction of independent suits by receivers or trustees to courts where the bankrupt might have brought or prosecuted them if proceedings under the Act had not been instituted, with certain stated exceptions, "unless by consent of the defendant". The consent provided for by § 23b was intended to enlarge the jurisdiction of the federal district courts so as to give them jurisdiction over suits which do not fall within the exceptions named and which the bankrupt could not have brought if proceedings under the Act had not been commenced. It is also necessary to consider § 2a(7), and especially the 1952 amendment to that section in connection with consent to jurisdiction.

As to the effect of consent on the district court sitting as court of bankruptcy, it was pointed out in MacDonald vs. Plymouth County Trust Co., 286 U.S. 263, 20 Am B.R. (N.S.) 1, 52 S.Ct. 505, 76 L.Ed. 1093, that § 23b, read together with the definition of "court" in § 1(9), indicates that the district court in which the bankruptcy proceedings are pending is designated as a court where the trustee or receiver may bring the suit if consent is obtained. The theory is, particularly, in suits where the bankruptcy court would have had jurisdiction of the plenary action that since the parties have only a procedural right to have the issues determined in a plenary action, they are at liberty to waive this right and acquiesce in a summary method of procedure. Nor have the courts found any difficulty in deciding that consent will confer jurisdiction to adjudicate summarily the rights of adverse claimants who would otherwise be entitled to a plenary suit in the federal or a state court.

Once consent to the summary jurisdiction of the bankruptcy court appears, that jurisdiction generally will be retained for the determination of all the claims of the parties and for the enforcement of all their rights against each other. Consent having been given, it may not subsequently be withdrawn by a party; nor may the party, upon appeal from the decision, raise the question of want of jurisdiction.

Consent, as hereafter demonstrated, may be (1) express; (2) by waiver through failure to raise the proper objection, or (3) implied from any act indicating a willingness on the part of the party that his claim or interest be determined summarily by the bankruptcy court.

In Peoples National Bank of Strasburg, Va. v. Green, 296 F. 294 (4th Cir. 1924), it is stated:

> The purpose of a plenary suit is to bring in one who has not voluntarily made himself a party to the proceedings in bankruptcy. It is unnecessary,

even as against an adverse claimant who has of his own motion submitted his rights to the determination of the court in bankruptcy. In re Hollingsworth & Whitney Co. (C.C.A. 1st Cir.), 242 Fed. 753, 155 C.C.A. 341, 39 Am B.R. 678. The law says he may not be compelled to come into the bankruptcy court and cannot be forced to answer otherwise in a plenary suit. All this, however, is merely for his protection, and he may waive it (Salsburg v. Blackford [C.C.A. 4th Cir.], 204 Fed. 438, 122 C.C.A. 624, 29 Am B.R. 320), as he does if, of his own motion, he comes into the bankruptcy court and asks it to determine what rights, if any, the trustee has in particular property.

■■ This court concludes therefore, that it has jurisdiction to summarily decide the issues between Brockington and the bankrupt and to enter judgment. The findings and conclusions of the Referee are therefore adopted and made a part of this decree, except that for the reasons above stated it will not be necessary for the Trustee to bring plenary actions for enforcement.

IT IS THEREFORE ORDERED that:

The Trustee continue to collect the rental from that part of the building leased by the trustee with the approval of the Referee to the present tenant or other suitable tenant for the term of the lease. From the rentals collected the trustee shall pay all back rent due to the lessor; reimburse the lessor for all taxes and insurance heretofore paid by the lessor; and in the future continue to pay the required rental and taxes and insurance assessed against said property.

Further ordered that:

The Trustee have judgment against William J. Brockington on his two promissory notes in the sum of Eighteen Thousand Seven Hundred Fifty and No/100 ($18,750.00) Dollars, with interest thereon from January 1, 1966, at the rate of five per cent (5%) per annum to the date of this judgment.

And it is so ordered.